MICHAEL, Circuit Judge,
dissenting:
North Carolina has enacted, within the bounds of the First Amendment, a cam- . paign finance law that is aimed at promoting transparency and openness in the electoral processes of that state. Today the majority strikes down key provisions in that law and severely restricts the well-established power of a state to regulate its elections. One result will be that organizations and individuals will be able to easily disguise their campaign advocacy as issue advocacy, thereby avoiding regulation. The majority thus allows these organizations and individuals to conceal their identities, spend unlimited amounts on campaign advertising masked as discussion of issues, and “hide themselves from the scrutiny of the voting public.” McConnell v. Fed. Election Comm’n, 540 U.S. 93, 197, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (internal quotation marks omitted). Another result is that there can be no limits on the size of contributions to independent political committees. Allowing unlimited contributions to these political committees is a heavy blow to the state’s interest in combating the “ ‘pernicious influence’ ” of too much money in politics. See id. at 115, 124 S.Ct. 619 (quoting United States v. Int’l Union United Auto., Aircraft & Agric. Implement Workers of Am., 352 U.S. 567, 572, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957)).
First, the majority invalidates, as unconstitutional on its face, the North Carolina Act’s test for determining whether a political advertisement “support[s] or oppose[s] the nomination or election of one or more clearly identified candidates.” N.C. Gen. Stat. § 163-278.14A(a)(2). The test allows factors — such as timing, cost, reach, and language — to be considered in determining whether an advertisement “could only be interpreted by a reasonable person as advocating the nomination, election, or defeat” of a specific candidate in a specific election. Id. (emphasis added). This objective test is constitutional because sufficient governmental interests justify the minimal burden it places on speech. Furthermore, the test is vital to the North Carolina Act because, as the Supreme Court has recognized, the most effective campaign advertisements often couch their message in subtle language, thereby avoiding regulation in the absence of a more encompassing test like North Carolina’s. McConnell, 540 U.S. at 127, 124 S.Ct. 619. The majority’s elimination of this test means that much electoral advocacy in North Carolina will be free of contribution limits, disclosure requirements, and limits on corporate and union spending.
Second, the majority strikes down North Carolina’s definition of political committee — an organization with “a major purpose” of electoral advocacy. § 163-278.6(14)d. The majority requires use of the words “the major purpose” that appear in Buckley v. Valeo, 424 U.S. 1, 79, 96 *309 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per cu-riam). Buckley holds that “groups engaged purely in issue discussion” may not be regulated as political committees. Id. Nothing in Buckley suggests that placing the article “the” before “major purpose” is an absolute requirement. Nothing in Buckley prevents a state from concentrating on the word “major” and regulating organizations with “a major purpose” of electoral advocacy. The regulation is clear because, after all, a major purpose is simply a principal or conspicuous purpose, one that will be readily detectible. Completely excluding organizations that have electoral advocacy as a major purpose will allow many politically active organizations to escape regulation and hide their identities and activities from public scrutiny.
Finally, the majority strikes down North Carolina’s contribution limits, § 163— 278.13, as applied to independent expenditure committees. In doing so, the majority ignores that North Carolina has met its burden for imposing such limits. The state has provided substantial evidence of the corrupting influence of independent expenditures in the political process. There is no constitutional basis for depriving the state of an important tool — limits on contributions to independent committees — in combating this corruptive influence.
I respectfully dissent.
I.
I begin with an overview of Supreme Court precedent.
The power of the legislative branches to regulate elections “is well established.” Buckley v. Valeo, 424 U.S. 1, 13, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Accordingly, for over a century Congress and state legislatures have enacted legislation “to purge ... politics of what was conceived to be the pernicious influence of ‘big money’ campaign contributions.” McConnell v. Fed. Election Comm’n, 540 U.S. 93, 115, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (quoting United States v. Int’l Union United Auto., Aircraft & Agric. Implement Workers of Am., 352 U.S. 567, 572, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957)) (internal quotation marks omitted); see also Auto. Workers, 352 U.S. at 570-76, 77 S.Ct. 529. In an effort to protect against the “political potentialities of wealth” that “shake the confidence of the plain people of small means of this country in our political institutions,” legislatures have imposed a variety of regulations on the financing of political campaigns. McConnell, 540 U.S. at 115, 116, 124 S.Ct. 619 (quoting Auto. Workers, 352 U.S. at 571, 577-78, 77 S.Ct. 529) (internal quotation marks omitted).
The Supreme Court has reviewed these legislative efforts with “ ‘considerable deference,’ ” McConnell, 540 U.S. at 117, 124 S.Ct. 619 (quoting Fed. Election Comm’n v. Nat’l Right to Work Comm., 459 U.S. 197, 209, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982)), because of the vital governmental interests in protecting “the ‘free functioning of our national institutions’ ” and fostering the confidence of our citizens, Buckley, 424 U.S. at 66, 96 S.Ct. 612 (quoting Communist Party v. Subversive Activities Control Bd., 367 U.S. 1, 97, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961)). Foremost among the governmental interests recognized by the Court is that of preventing “the actuality and appearance of corruption resulting from large individual financial contributions.” Buckley, 424 U.S. at 26, 96 S.Ct. 612. The Court has taken a broad view of this interest. Hence, it has “ ‘recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors.’ ” McConnell, 540 U.S. at 143, 124 S.Ct. 619 (quoting Nixon v. Shrink Missouri Gov’t PAC, 528 U.S. 377, 389, 120 S.Ct. 897, 145 *310 L.Ed.2d 886 (2000)). In addition, the Court has recognized the need for legislative regulation to guard against the appearance of corruption and to prevent “ ‘the cynical assumption that large donors call the tune,’ ” an assumption that “ ‘could jeopardize the willingness of voters to take part in democratic governance.’ ” Id. at 144, 124 S.Ct. 619 (quoting Shrink Missouri, 528 U.S. at 390, 120 S.Ct. 897). The Court has further recognized that the unrelenting and imaginative efforts of some political participants to circumvent almost every new campaign finance regulation qualifies as “ ‘a valid theory of corruption,’ ” a theory that is sufficient to justify prophylactic laws that extend beyond the regulation of direct political contributions. Id. (quoting Fed. Election Comm’n v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 457, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001)). Thus, the Court has held that the weighty governmental interest in preventing political corruption and its appearance justifies a broad range of regulations, including prohibitions on certain campaign expenditures and contributions from general treasury funds of for-profit corporations, non-profit corporations, and unions; federal caps on contributions to and from state and federal political parties, state and federal candidates, and political committees; public disclosure requirements for political contributions and expenditures; comprehensive regulation of political committees; and limits on how and for whom a candidate or political party can solicit funds. See, e.g., McConnell, 540 U.S. at 133-224, 124 S.Ct. 619; Fed. Election Comm’n v. Beaumont, 539 U.S. 146, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003); Nat’l Right to Work, 459 U.S. 197, 103 S.Ct. 552; Buckley, 424 U.S. at 23-38, 60-84, 96 S.Ct. 612; Burroughs v. United States, 290 U.S. 534, 544-48, 54 S.Ct. 287, 78 L.Ed. 484 (1934).
The Court has also recognized several additional important governmental interests that justify disclosure requirements. “Disclosure provides the electorate with information ‘as to where political campaign money comes from and how it is spent by the candidate’ in order to aid the voters in evaluating those who seek ... office.” Buckley, 424 U.S. at 66-67, 96 S.Ct. 612 (citation omitted). “[R]ecordkeeping, reporting, and disclosure requirements are also an essential means of gathering the data necessary to detect violations” of substantive regulations. Id. at 67-68, 96 S.Ct. 612; see McConnell, 540 U.S. at 196, 124 S.Ct. 619. Furthermore, the government has a significant interest in “assuring that disclosures are made promptly and in time to provide relevant information to voters.” McConnell, 540 U.S. at 200, 124 S.Ct. 619.
Of course, our inquiry into the validity of a. campaign finance regulation does not end with the recognition of important governmental interests. We must examine the degree to which the regulation burdens First Amendment rights and evaluate whether the governmental interests are sufficient to justify that burden. See, e.g., Buckley, 424 U.S. at 68, 96 S.Ct. 612. Thus, because limits on political contributions “entail[ ] only a marginal restriction upon the contributor’s ability to engage in free communication,” Buckley, 424 U.S. at 20, 96 S.Ct. 612, these regulations are “closely drawn to match [the] sufficiently important interest” of preventing corruption and its appearance. McConnell, 540 U.S. at 136, 124 S.Ct. 619 (internal quotation marks omitted); see also Buckley, 424 U.S. at 25, 96 S.Ct. 612. Likewise, disclosure requirements “do not prevent anyone from speaking,” McConnell, 540 U.S. at 201, 124 S.Ct. 619 (internal quotation marks and alteration omitted), although they can “infringe on privacy of association and belief guaranteed by the First Amendment,” Buckley, 424 U.S. at 64, 96 S.Ct. *311 612. We therefore require that “there be a ‘relevant correlation’ or ‘substantial relation’ between [an important] governmental interest and the information required to be disclosed.” Id. (citations omitted); see McConnell, 540 U.S. at 196, 124 S.Ct. 619. Regulations requiring disclosure of campaign-related contributions and expenditures and those requiring political committees to make regular reports meet this test. See Buckley, 424 U.S. at 68, 79-82, 96 S.Ct. 612.[1]
In one specific area — complete bans on independent political expenditures — the Supreme Court has held that “the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify” the regulation. Id. at 45, 96 S.Ct. 612. Unlike other campaign regulations, bans on independent expenditures “impose direct and substantial restraints on the quantity of political speech.” Id. at 39, 96 S.Ct. 612. They are unconstitutional as a general proposition because they leave the speaker no alternative forum for speech.
In Buckley and the cases that followed, the Supreme Court established these clear rules for determining whether a campaign finance regulation is overly broad. Nonetheless, the majority inexplicably questions the well-established proposition that “the burdens imposed on political speech and the state’s interests may vary by the type of regulation.” Ante at 299. This refusal to accept decades of Supreme Court precedent highlights the majority’s fundamental misunderstanding and resulting misapplication of the law. Instead of applying precedent, the majority employs its own theory — that any regulation of campaign expenditures or contributions amounts to a direct and therefore inherently suspect restraint on speech, regardless of the type of regulation. As a result, the majority requires all regulations to meet an improperly high bar in order to pass constitutional muster. See, e.g., ante at 280-86 (applying test from Federal Election Commission v. Wisconsin Right to Life, Inc.,—U.S.-, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007), developed in the strict scrutiny context, to strike down portions of North Carolina’s contribution, disclosure, and political committee regulations); id. at 290 (striking down political committee definition because “narrower means exist”); id. at 299-300 (refusing to distinguish between types of regulations because “[s]peakers are going to have to contend with [the] same infirmities for both expenditures and contributions regardless of ... the regulatory context”). In contrast, the Supreme Court requires that in an overbreadth challenge we consider each regulation’s actual burden on speech and weigh that burden against the governmental interests that justify it. Further, the “strong medicine” of over-breadth may only be applied to strike down a statute when “a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” Wash. State Grange v. Wash. State Republican Party,—U.S.-,-n. 6, 128 S.Ct. 1184, 1190 n. 6, 170 L.Ed.2d 151(2008) (internal quotation marks omitted); see McConnell, 540 U.S. at 207, 124 S.Ct. 619.
In addition to the requirement that an election regulation may not be overly broad, the regulation may not be unconstitutionally vague. As the majority explains, to overcome vagueness concerns, a regulation must be sufficiently clear to avoid “foster[ing] arbitrary and discrimina *312 tory application,” and it must “give fair notice to those to whom [it] is directed.” McConnell, 540 U.S. at 223, 124 S.Ct. 619 (quoting Buckley, 424 U.S. at 41 n. 48, 96 S.Ct. 612; Am. Commc’ns Ass’n v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)) (internal quotation marks omitted).
To succeed in a facial challenge, a plaintiff must carry the “heavy burden of proving” that a regulation is overly broad, McConnell, 540 U.S. at 207, 124 S.Ct. 619, or vague. As the Supreme Court recently explained in rejecting a facial challenge to a state election regulation, “[fjacial challenges are disfavored for several reasons.” Id. at 1191. Facial challenges “often rest on speculation,” “run contrary to the fundamental principle of judicial restraint,” and, perhaps most important, “threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.” Id. Instead of following these instructions to tread carefully in assessing facial challenges, the majority impermissibly relies on “hypothetical and imaginary” examples, many of which were not even posited by the plaintiffs, to strike down North Carolina’s regulations. Id. at 1190 (internal quotation marks omitted).
The contested provisions of the North Carolina Act are well within the boundaries established by the Supreme Court, as the following discussion makes clear.
II.
The majority holds N.C. GemStat. § 163-278.14A(a)(2) unconstitutionally overbroad and vague. It is neither.
A.
Section 163-278.14A provides regulators (and likewise, speakers) guidance for determining whether “communications are ‘to support or oppose the nomination or election of one or more clearly identified candidates.’ ” § 163-278.14A. The guidance provided in § 163-278.14A is important to the Act because many of its regulations hinge on whether a given communication “supports or opposes the nomination or election of one or more clearly identified candidates.” This operative phrase is used in the separate definitions of “contribution,” “expenditure,” “independent expenditure,” “political committee,” and “referendum committee.” § 163-278.6(6), (9), (9a), (14), (18b). These activities or organizations are, in turn, regulated throughout the Act in the following ways. Political committees and referendum committees are subject to regular reporting requirements and must have a designated treasurer to keep accurate records. § 163— 278.7 to .11. Candidates, committees, and individuals must disclose information about their contributions and expenditures. § 163-278.8, .9, .9A, .11, .12, .39. Contributions to a political committee, referendum committee, or candidate are capped at $4000 per donor, per election. § 163— 278.13.[2] Finally, certain types of corporations and labor unions are forbidden from making contributions or expenditures, except from segregated funds. § 163-278.19. The words “support or oppose” also appear in a provision requiring additional disclosures for “television and radio advertisements supporting or opposing the nomination or election of one or more clearly identified candidates.” § 163-278.39A.
Section 163-278.14A has two parts that describe the evidence that a regulator can *313 use to determine, for enforcement purposes, whether a communication “supports or opposes” a candidate. The first part, which the plaintiffs do not challenge, lists specific words and phrases that, when used, are a means of determining whether a communication “supports or opposes” a specific candidate. § 163-278.14A(a)(l). These phrases include a list of “magic words,” such as “vote for” and “reject,” similar to those set forth in Buckley. See Buckley, 424 U.S. at 44 n. 52, 96 S.Ct. 612. The second part allows regulators to consider additional evidence if a specific phrase or word listed in the first part does not appear in the communication. Under the second part, a regulator may consider “[ejvidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election.” § 163-278.14A(a)(2). However,
[i]f the course of action is unclear, contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate’s election, and the cost of the communication may be considered in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election. Id.
The majority, using a rigid test that it has developed with no support in precedent, holds that § 163-278.14A(a)(2) is overly broad and vague.
B.
I begin by explaining how the majority seriously misconstrues Supreme Court precedent with respect to the regulation of express electoral advocacy and issue advocacy. In Buckley the Supreme Court found the definition of “expenditure” in the Federal Election Campaign Act of 1971 (FECA), 86 Stat. 3 (1972), as amended by 88 Stat. 1263 (1974), to be vague and potentially overbroad. Buckley, 424 U.S. at 40-45, 79-80, 96 S.Ct. 612. In order to ensure that FECA’s expenditure limitations hewed to the purposes of the statute, and thus were not over-broad, Buckley interpreted the term “expenditure” to apply only to “communications that in express terms advocate the election or defeat of a clearly identified candidate.” Id. at 44, 96 S.Ct. 612. In addition, the Court provided several examples of words (“vote for,” “elect,” “support”) that would appear in communications that fit its definition of “express advocacy.” Buckley, 424 U.S. at 44 & n. 52, 80, 96 S.Ct. 612. Several circuit courts interpreted Buckley to mean that any definition of express advocacy in state campaign finance regulations must be limited to speech that includes only “magic words” such as those listed in Buckley. See, e.g., N.C. Right to Life, Inc. v. Leake (NCRL II), 344 F.3d 418, 424-27 (4th Cir.2003), vacated, 541 U.S. 1007, 124 S.Ct. 2065, 158 L.Ed.2d 617 (2004).
In McConnell, however, the Supreme Court rejected this interpretation of Buckley, emphasizing that
a plain reading of Buckley makes clear that the express advocacy limitation, in both the expenditure and disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the FECA provisions in Buckley to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad *314 would be required to toe the same express advocacy line.
McConnell, 540 U.S. at 191-92, 124 S.Ct. 619 (footnote omitted). McConnell explained that, instead of requiring a formal division between different types of advocacy, the First Amendment allows legislatures to craft their own regulations as long as they do not directly prohibit speech and are sufficiently related to important concerns about the electoral process. Congress operated within these bounds in enacting the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 81 (2002), because
Buckley’s magic words requirement is functionally meaningless. Not only can advertisers easily evade the line by eschewing the use of magic words, but they would seldom choose to use such words even if permitted. And although the resulting advertisements do not urge the viewer to vote for or against a candidate in so many words, they are no less clearly intended to influence the election. Buckley’s express advocacy line, in short, has not aided the legislative effort to combat real or apparent corruption, and Congress enacted BCRA to correct the flaws it found in the existing system.
Id. at 193-94, 124 S.Ct. 619 (citations and footnotes omitted).
In rejecting the notion “that the First Amendment erects a rigid barrier between express advocacy and so-called issue advocacy” that only allows regulation of express advocacy, id. at 193, 124 S.Ct. 619, the Court in McConnell refused to declare BCRA’s regulation of “electioneering communications” unconstitutional simply because it failed to incorporate the Buckley express advocacy test. Instead, McConnell examined the regulation for overbreadth and vagueness and concluded that it was both substantially related to its campaign regulation purpose and sufficiently clear, and thus facially constitutional. Id. at 189-211, 124 S.Ct. 619. McConnell holds that courts may no longer require legislatures “to treat so-called issue advocacy differently from express advocacy.” Id. at 194, 124 S.Ct. 619. Rather, courts must allow legislatures to craft carefully, within the general limits imposed by the First Amendment, regulations to respond to the changing realities of modern electoral advocacy, including efforts to circumvent every new round of regulation. Accordingly, when courts review a facial challenge to a campaign finance regulation, McConnell requires that deference be accorded to legislative decisions about the types of communications that should be regulated. A regulation may be struck down only if it is unconstitutional in a substantial number of applications or is too vague to provide notice.
Of course, because a facially valid election regulation can have unconstitutional applications, the regulation remains susceptible to a proper as-applied challenge. See Wis. Right to Life, Inc. v. Fed. Election Comm’n (WRTL I), 546 U.S. 410, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (per curiam). Thus, in Federal Election Commission v. Wisconsin Right to Life, Inc. CWRTL II),-U.S.-, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007), a plurality of the Court concluded that BCRA § 203’s prohibition of “electioneering communications” (approved on its face in McConnell) could not be applied to a specific broadcast, unless that broadcast “is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” 127 S.Ct. at 2667 (opinion of Roberts, C.J.). According to the Court, this is “the proper standard for an as-applied challenge ” to a statute that is permissible on its face. Id. at 2666 (emphasis added). This standard does not *315 affect McConnell’s holding that § 203 is facially constitutional. Holding a statute facially unconstitutional requires “ ‘prohibiting all enforcement’ ” of the statute, a drastic result that can only be justified if the statute’s “application to protected speech is substantial.” McConnell, 540 U.S. at 207, 124 S.Ct. 619 (quoting Virginia v. Hicks, 539 U.S. 113, 120, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003)). Section 203 is facially constitutional because it does not, on its face, apply to a substantial amount of protected speech; it mostly applies to “election-related advertising,” which can be constitutionally regulated. Id. McConnell necessarily recognizes, however, that the section might be applied to protected speech in limited circumstances. Id. WRTL II’s reasonableness test by its own terms is only designed to identify and remedy this small subset of unconstitutional applications of an otherwise facially valid election regulation.
Ignoring the Court’s distinction between as-applied and facial challenges, the majority claims that McConnell and WRTL II established a bright line rule for facial challenges that divides acceptable regulations (covering express advocacy) from unacceptable regulations (covering issue advocacy). All election regulations are unconstitutional unless they expressly adhere to the majority’s strict construct, which is as follows. The majority first, and uncontroversially, states that any election regulation is facially constitutional if it is limited to regulating specific “magic words.” If, however, a legislature wishes to regulate any speech that avoids the magic words, the majority would require the statute to include (exactly) the following formulation on its face: (1) the exact terms required by the definition of “electioneering communication” in BCRA, that is, the communication must (a) refer to a clearly identified candidate (b) within 60 days of a general election or 30 days of a primary election and (c) be able to be received by 50,000 or more persons in the candidate’s district or state, see 2 U.S.C. § 434(f)(3)(A)(I), (C); and (2) the communication must be “susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” Ante at 282. This narrow, rigid approach has several fatal flaws.
First, the majority fails to recognize that McConnell explicitly “rejected the notion that the First Amendment requires [legislatures] to treat so-called issue advocacy differently from express advocacy.” McConnell, 540 U.S. at 194, 124 S.Ct. 619. Instead of drawing a rigid line between speech that can and can not be regulated as the majority does today, the Court granted legislatures leeway to craft election regulations that meaningfully address the realities of modern electoral advocacy — as long as those regulations are substantially related to the government’s important interests in protecting the democratic process. See id. at 189-94, 124 S.Ct. 619. Unlike the majority, McConnell grants deference to these legislative judgments by requiring courts reviewing facial challenges to conduct traditional vagueness and overbreadth analyses in determining whether regulations comply with the First Amendment.
Second, the majority holds, as a constitutional rule, that an election regulation that goes beyond Buckley’s magic words is permissible only if it adopts the exact requirements Congress imposed in BCRA for “electioneering communications.” See ante at 282 (“[T]he [regulated] communication must qualify as an ‘electioneering communication’ defined by [BCRA] ....” (emphasis added)). But the only support the majority cites for this proposition is a footnote in WRTL II — a case analyzing an *316 as-applied challenge to the direct expenditure limit in BCRA § 203. Id. The WRTL II footnote responds to a concern that the plurality’s reasonableness test is too vague by admonishing the reader to “keep in mind” that the test is also limited by “the bright line requirements of BCRA § 203.” 127 S.Ct. at 2669 n. 7. Nowhere does WRTL II state that the specific requirements of BCRA § 203 are the only way that a statute could be sufficiently clear; nor does WRTL II even purport to adopt BCRA’s requirements to avoid over-breadth. Furthermore, in addition to BCRA § 203, the Supreme Court has found various formulations of regulatory language to be acceptable, especially in areas other than direct expenditures limits, even though they encompass more speech than Buckley’s definition of express advocacy. See, e.g., Buckley, 424 U.S. at 23 n. 24, 96 S.Ct. 612 (allowing regulation of contributions made for “political purposes”); McConnell, 540 U.S. at 170 n. 64, 184-85,124 S.Ct. 619 (upholding regulation of “a communication that ‘refers to a clearly identified candidate ... and that promotes or supports a candidate ... or attacks or opposes a candidate’ ” (quoting 2 U.S.C. § 431(20)(A)(iii))). The majority clearly errs by mandating the elements of BCRA § 203, which is simply an example of a clear and sufficiently tailored statute, as an essential part of any campaign regulation.
Third, the majority fails to recognize that the WRTL II reasonableness test for the “functional equivalent of express advocacy” was developed to determine whether, in the ' actual application of BCRA § 203, an organization could be forbidden from broadcasting a particular advertisement. McConnell had already held that, in a facial challenge, the regulator need only show that a statute is not vague or overbroad. McConnell, 540 U.S. at 192, 124 S.Ct. 619. According to McConnell, BCRA’s definition of “electioneering communication” — a communication that refers to a clearly identified candidate; is made within 60 days of a general election or 30 days of a primary; and can be received by at least 50,000 persons in the candidate’s district or state — withstood vagueness and overbreadth challenges. Id. at 189-211, 124 S.Ct. 619. Needless to say, BCRA was not, on its face, required to include WRTL II’s reasonableness test.
Fourth, the majority adopts its test without regard for the type of regulation implicated. It ignores the fact that a proper overbreadth analysis considers the burden on First Amendment rights as balanced against the strength of the governmental interest. McConnell rejected a bright line test like the majority’s and mandated a return to traditional over-breadth analysis. McConnell, 540 U.S. at 192, 205, 124 S.Ct. 619. Nonetheless, the majority states that every regulation must pass its test regardless of the actual impact that the regulation has on speech or the governmental interests that might justify it.[3] As a result, the majority’s decision to strike down § 163-278.14A(a)(2) on its face means that no election regulation is constitutional unless its terms limit its application to extremely narrow circumstances: specifically, all regulations must enumerate words of express advocacy or incorporate BCRA’s definition of “electioneering communication” and WRTL IBs reasonableness test. The majority imposes this same rule on all types of regulations, whether they be disclosure re *317 quirements, contribution limits, political committee definitions, or direct restraints on expenditures. The Supreme Court has consistently applied exactly the opposite rule, subjecting different types of regulations, depending on the burdens imposed on speech, to different levels of scrutiny. If the majority had considered the substantive regulations affected by § 163-278.14A(a)(2), it would have recognized that they (inasmuch as they affect the plaintiffs) do not impose expenditure limits, the restraint on speech addressed in WRTL II. Instead, the majority’s rule applies the WRTL II analysis to disclosure requirements, contribution limits, and political committee designations. No other court has applied WRTL II to all types of campaign finance regulations; instead, every court to address the issue has rejected any application beyond direct limits on corporate expenditures. See Cal. Pro-Life Council, Inc. v. Randolph, 507 F.3d 1172, 1177 n. 4 (9th Cir.2007) (WRTL II analysis is inapplicable to analysis of disclosure requirements); Citizens United v. Fed. Election Comm’n, 530 F.Supp.2d 274, 280-81 (D.D.C.2008) (same); Shays v. U.S. Fed. Election Comm’n, 508 F.Supp.2d 10, 29 (D.D.C.2007) (WRTL II analysis is inapplicable to coordinated expenditures); Fed. Election Comm’n v. Kalogianis, No. 8:06-cv-68-T-23EAJ, 2007 WL 4247795, at *4 (M.D.Fla. Nov.30, 2007) (WRTL II analysis is inapplicable to analysis of corporate contribution limits); Voters Educ. Comm. v. Wash. State Public Disclosure Comm’n, 161 Wash.2d 470, 166 P.3d 1174, 1183 n. 8 (2007) (WRTL II analysis is inapplicable to vagueness challenge to political committee definition).
Thus, the majority errs by ignoring McConnell’s rejection of any rigid constitutional rule that divides constitutionally protected speech from speech that can be regulated in the area of campaign finance regulation; errs by requiring the exact terms of BCRA referred to in passing by WRTL II; errs by ignoring the difference in treatment between facial and as-applied challenges that the Supreme Court requires; and errs by applying the same rule to every type of regulation, rather than conducting an overbreadth analysis based on the purpose and effect of the regulation. Furthermore, because the majority’s holding strikes down § 163-278.14A(a)(2) on its face, it strikes down every application of the statute — from disclosure requirements to contribution limits and even to limits on corporations and unions that North Carolina Right to Life, Inc. (NCRL) has no standing to challenge.[4] The majority’s rigid rule lacks any supportable basis: it is constructed from a mixture of ideas that are either taken out of context or extended far beyond precedent. The result, as this case demonstrates, will be the invalidation of many election regulations that have been carefully drafted to honor and comply with First Amendment principles, as established by decades of Supreme Court precedent. When the plaintiffs’ over-breadth and vagueness challenges are analyzed under the traditional constitutional standards required by McConnell and other relevant precedent, the error in the majority’s approach becomes even clearer. I turn now to that analysis.
C.
The majority holds that the definition of “to support or oppose the nomination or *318 election of one or more clearly identified candidates” in § 168-278.14A(a)(2) is unconstitutionally vague. Ante at 283. I disagree because the definition gives particularly clear direction to both speakers and regulators, thus meeting the standard for constitutional clarity.
The Supreme Court has explicitly rejected a vagueness challenge to BCRA § 301(20)(A)(iii), which defines a type of “federal election activity” as “a public communication that refers to a clearly identified candidate for Federal office ... and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate).” 2 U.S.C. § 431(20)(A)(iii); see McConnell, 540 U.S. at 170 n. 64, 124 S.Ct. 619. The Court held that “[t]he words ‘promote,’ ‘oppose,’ ‘attack,’ and ‘support’ clearly set forth the confines within which potential ... speakers must act in order to avoid triggering the provision.” McConnell, 540 U.S. at 170 n. 64, 124 S.Ct. 619; see also Voters Educ. Comm., 166 P.3d at 1184 (the phrase “in support of, or opposition to, any candidate” in state political committee definition is not unconstitutionally vague).
BCRA § 301(20)(A)(iii) is nearly identical to the “support or oppose” phrase that appears throughout the North Carolina Act. Thus, the legislature need not have provided any clarification of “support or oppose” because the Supreme Court has recognized that this phrase is sufficiently clear on its face. Nonetheless, the legislature took pains to provide additional guidance to regulators and speakers by explaining the type of evidence that could be used in determining whether a certain communication actually does “support or oppose the nomination or election of one or more clearly identified candidates.” This extra legislative guidance does not render a clear phrase unconstitutionally vague; instead it provides additional clarity and helps to streamline the decision making process when questions arise regarding application of the language to particular communications.
Even considering the clarifying terms outside of their context, as the majority does, their meaning is clear. The first sentence in part (a)(2) allows regulators to consider “[ejvidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election.” § 163-278.14A(a)(2). The majority complains that the phrase “essential nature” is impermissibly vague. Ante at 283. “Essential” means “constituting an indispensable structure, core, or condition of a thing: basic, fundamental.” Webster’s Third New Int’l Dictionary 777 (2002). It is plain that the sentence in question clarifies “supports or opposes” to apply only to communications that direct voters to act for or against a candidate. The phrase “essential nature” clarifies that the sentence cannot reach any communication that is incidentally directed at campaign issues; instead the communication’s basic message must direct voter action regarding a candidate. See Fed. Election Comm’n v. Mass. Citizens for Life, Inc. CMCFL), 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (“The fact that [the flier’s] message is marginally less direct than ‘Vote for Smith’ does not change its essential nature.”).
The majority also complains that there is a lack of clarity in the remainder of § 163-278.14A(a)(2), which allows a regulator to consider various contextual factors (in an objective light) “[i]f the [regulator’s] course of action is unclear” after evaluat *319 ing the communication under the first sentence of part (a)(2). § 163-278.14A(a)(2). The majority seizes on the quoted phrase as “an explicit confession from the statute itself of its fatal vagueness and over-breadth.” Ante at 297. But the phrase recognizes the realities of political advocacy; it is not a confession of a fatal flaw. As an initial matter, the legislature cannot be confessing to vagueness and over-breadth in the governing term, “support or oppose,” a term the Supreme Court has upheld against both vagueness and over-breadth challenges as I explained above. Rather, the legislature wrote the sentence beginning with the phrase “If the course of action is unclear” to provide additional guidance to regulators. In other words, the legislature acknowledged that in some circumstances a regulator might be assisted by direction beyond the first sentence in part (a)(2) in determining whether a communication “supports or opposes” a candidate; and the legislature then provided a solution by spelling out the objective factors.
The majority finally finds fault with the factors listed for consideration in the second sentence of part (a)(2): “ ‘the language of the communication as a whole,’ ‘the timing of the communication in relation to events of the day,’ ‘the distribution of the communication to a significant number of registered voters for that candidate’s election,’ and ‘the cost of the communication.’ ” Ante at 283-84. Again, the majority fails to consider these terms in the context of the entire provision. The terms spell out the factors that “may be considered in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.” § 163-278.14A(a)(2) (emphasis added). Thus, the evidentiary factors that the majority finds unclear are not the endpoint of the inquiry, but rather they assist the regulator in reaching a clear and objective conclusion. Read as a whole, the second part of the “support or oppose” test provides an objective basis for a regulator to determine whether a communication is clearly, and indisputably, electoral advocacy. The majority’s decision to strike down this test blocks the legislature’s careful effort to provide the maximum amount of guidance. The majority concludes that “North Carolina remains free to enforce all campaign finance regulations that incorporate the phrase ‘to support or oppose the nomination or election of one or more clearly identified candidates.’ ” Ante at 301. Under this ruling North Carolina can best accomplish its goals by eliminating § 163-278.14A entirely, providing no explanation or direction for how regulators should apply the phrase. If this section was eliminated, the remainder of the statute would necessarily survive a facial challenge under McConnell, while providing far less guidance than the statute as it stands. The majority would apparently accept this perverse result, overlooking the increase in regulatory discretion that would surely follow.
Section 163-278.14A(a)(2) gives clear guidance to regulators and speakers — significantly more than that required by the Supreme Court. The provision not only carefully defines its reach as covering communications that “support or oppose the nomination or election of one or more clearly identified candidates,” a standard effectively identical to one deemed constitutional in McConnell. It goes further by indicating the kind of evidence that is relevant to determining whether a communication “supports or opposes” a candidate. According to this provision, the Act’s requirements are triggered when the communication either (1) uses one of the exact words or phrases specified or (2) could only be objectively interpreted “as advo- *320 eating the nomination, election, or defeat” of a specific candidate in a specific election and is not a “mere discussion of public issues.” § 163-278.14A(a)(2). And the Act provides yet more guidance by directing a regulator to consider the timing, cost, reach, and language of the communication in determining whether a communication is electoral advocacy, thereby ensuring that the Act’s reach is limited. Id. Finally, if there is any remaining question of ambiguity, a potential speaker may seek further guidance from regulators, who must issue a binding advisory opinion, an option the plaintiffs in this case chose not to pursue. § 163-278.23; see McConnell, 540 U.S. at 170 n. 64, 124 S.Ct. 619; Buckley, 424 U.S. at 40 n. 47, 96 S.Ct. 612; J.A. 125. Section 163-178.14A(a)(2) — replete with direction to regulators and notice to speakers — is not unconstitutionally vague.
D.
Applying its new and rigid rule, the majority also holds § 163-278.14A(a)(2) to be overbroad. Again, I disagree.
To decide whether a regulation imper-missibly restricts protected speech, we must “look to the extent of the burden that [the regulation] placets] on individual rights” and “determinfe] whether [the governmental] interests are sufficient to justify” that burden. Buckley, 424 U.S. at 68, 96 S.Ct. 612. The level of governmental interest required (either important or compelling) and the degree to which the regulation must be tailored to that interest depends on the type of regulation imposed. Thus, a court must look directly to the limits imposed by the regulation — an examination the majority fails to undertake.
1.
I begin with the terms of the regulation to determine whether its reach is sufficiently related to its purpose of protecting the electoral process. On its face § 163— 278.14A(a)(2) limits the Act’s regulations to clear electoral advocacy. Section 163-278.14A explains the “evidence” that shows “that communications are ‘to support or oppose the nomination or election of one or more clearly identified candidates.’ ” § 163-278.14A. This section provides guidance to regulators enforcing the substantive provisions of the Act. Again, part (a)(1) of the section provides a list of examples of the types of words that may be used to determine that a communication is electoral advocacy. Part (a)(2) provides additional direction when the communication does not use an enumerated word or phrase. As discussed below, part (a)(2), the challenged part, is facially valid under the First Amendment.
Section 163-278.14A(a)(2) begins by allowing a regulator to consider “[e]vidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election.” This sentence restates Buckley’s express advocacy test through the language used by the Supreme Court in MCFL, rather than through the examples of specific words. In MCFL the Court noted that even though a flier describing candidates’ voting-records on abortion and urging readers to “VOTE PRO-LIFE” did not use the same language cited in Buckley and contained a disclaimer stating that it was not an endorsement of any candidate, it constituted express electoral advocacy. 479 U.S. at 243, 249, 107 S.Ct. 616. The MCFL Court explained:
The Edition [the flier] cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, it *321 provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally less direct than “Vote for Smith” does not change its essential nature. The Edition goes beyond issue discussion to express electoral advocacy.... The “Special Edition” thus ... represents express advocacy of the election of particular candidates distributed to members of the general public.
MCFL, 479 U.S. at 249-50, 107 S.Ct. 616. In the first sentence of § 163.278.14A(a)(2) North Carolina adopts, with little alteration, the express advocacy test provided in MCFL. It thus requires that the communication’s “essential nature” constitute “express[] electoral advocacy” and “go[] beyond a mere discussion of public issues” to direct “the general public” to vote for or against a specific candidate. § 163— 278.14A(a)(2); MCFL, 479 U.S. at 249-50, 107 S.Ct. 616.
Thus, like in MCFL, the first sentence of part (a)(2) only allows the term “support or oppose” to cover advocacy that directly and explicitly asks the public to vote for or against a candidate. This sentence advises a regulator to look to the text of the communication in order to determine whether it expressly advocates election or defeat of a candidate through the use of different words or symbols than the ones listed in part (a)(1). This sentence is therefore a vital stopgap to prevent easy circumvention of the magic words group, a problem that North Carolina combated in the past. See J.A. 867, 1017 (citing advertisements that escaped regulation by avoiding the “magic words” and using instead XXX or a circle with a line through it over the candidate’s face). Given that North Carolina adopted the exact language used by the Supreme Court in MCFL for the express advocacy test in the first sentence of part (a)(2), it is impossible to see how the majority could strike down this language as impermissibly broad.
The second sentence of part (a)(2) allows a regulator to consider additional evidence in determining whether a communication supports or opposes a clearly identified candidate “[i]f the [regulator’s] course of action is unclear.” § 163-278.14A(a)(2). This evidence is strictly limited to that showing the communication “could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of [a specific] candidate in [a specific] election.” Id. Thus, under this provision the substantive terms of the Act may only impact communications that advocate specific electoral action for or against a specific candidate in a specific election; the provision ensures that the Act’s terms do not impact communications that solely support or oppose issues. In other words, the communication must be “susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” WRTL II, 127 S.Ct. at 2667. North Carolina’s statute thus clearly and adequately limits the definition of “support or oppose” to electoral advocacy.
The majority holds that the use of “contextual factors,” such as those outlined in the second sentence of part (a)(2), is forbidden by WRTL II. Ante at 280-81, 283-84. The majority simply misreads WRTL II. WRTL II rejected consideration of certain factors that would show the “subjective intent ” of the sponsor of the communication, which was “irrelevant in an as-applied challenge.” 127 S.Ct. at 2668 (emphasis added); see id. at 2664-66 (distinguishing McConnell’s, holding that the “electioneering communication” prohibition survived a facial challenge because studies showed that the majority of covered ads were “intended to influence the voters’ decisions,” McConnell, 540 U.S. at 206, 124 S.Ct. 619). Further, WRTL II explicitly *322 recognized that “[c]ourts need not ignore basic background information that may be necessary to put an ad in context.” WRTL II, 127 S.Ct. at 2669. The contextual inquiry must, however, be limited to the objective nature of the communication. Id. at 2668-69. Thus, nothing in WRTL II says that the North Carolina legislature may not allow for the consideration of context in the application of its objective test for determining whether a communication is the functional equivalent of express advocacy. In fact, WRTL II adopts just such an objective test, relying like North Carolina on a “reasonable interpretation” of the effect of the communication. That the majority takes issue with North Carolina’s “could only be interpreted by a reasonable person” standard is nothing short of remarkable in light of its (the majority’s) clear approval of WRTL II’s “reasonable interpretation” test. See ante at 283. In addition, the factors listed in part (a)(2) closely track the BCRA requirements that — at least as a facial matter— are constitutional. Like BCRA § 203, part (a)(2) focuses on timing in relation to an election, clear identification of a specific candidate, and “distribution of the communication to a significant number of registered voters for that candidate’s election.” § 163-278.14A(a)(2). Compare 2 U.S.C. § 434(f)(3)(A)(i) (requiring clear identification of a candidate, time frames, and “targeting] to the relevant electorate”).
In writing the second part of its test for determining support of or opposition to a candidate, North Carolina sought to cover all electoral advocacy, including “phony issue ads.” J.A. 1027. This governmental interest was clearly recognized by the Supreme Court in McConnell when it upheld regulations of “public communication[s] that promote[ ] or attack[ ] a clearly identified federal candidate,” because such communications “directly affect[ ] the election in which [the candidate] is participating.” McConnell, 540 U.S. at 170, 124 S.Ct. 619; see also id. at 185, 124 S.Ct. 619 (allowing Congress to respond to “[t]he proliferation of sham issue ads”). If anything, McConnell and WRTL II provide further support for part (a)(2), which limits the definition of “support or oppose” to an objective test like the one approved by WRTL II. Thus, by adopting § 163-278.14A(a)(2), the North Carolina legislature worked to cover all express electoral advocacy and guard against circumvention of its regulations, while still protecting true issue advocacy from any unconstitutional regulatory burden.
2.
Section 163-278.14A does not operate alone; its purpose is to define the Act’s substantive terms. Therefore, we can only truly understand any burdens imposed by the provision, and the various governmental interests that support it, by considering how it is used in the Act’s substantive regulations. The Act imposes four general types of regulation: political committee organizational requirements, disclosure requirements, contribution limits, and limits on expenditures by certain types of corporations and labor unions. I go through each of these categories of regulation to determine whether § 163-278.14A(a)(2) defines “support or oppose” in a way that causes the substantive regulations to impose burdens that outweigh the governmental interests that justify them. I conclude — using the second part of the definition of “support or oppose”— that the regulations are sufficiently correlated to important governmental interests, and therefore the second part does not render the Act’s regulations overbroad.
*323 First, the Act imposes a regulatory burden on any group that “makes, or accepts anything of value to make, contributions or expenditures” and “[h]as as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.” § 163-278.6(14). Such a group, by this definition, is a political committee and is therefore subject to regular reporting of its contributions and expenditures and is required to designate a treasurer who has record keeping responsibilities. § 163-278.7 to .11. As long as the definition of political committee does not “reach groups engaged purely in issue discussion,” but instead covers groups focused on “the nomination or election of a candidate,” the Supreme Court has approved regulation of such groups (or political committees) as sufficiently tailored to important governmental interests. Buckley, 424 U.S. at 79, 96 S.Ct. 612. The phrase “support or oppose the nomination or election of one or more clearly identified candidates,” with the attendant requirements that limit its meaning, is, if anything, more narrowly focused to the governmental purpose of regulating political committees than Buckley's formulation— “the nomination or election of a candidate.” Even the majority recognizes that political committee regulations can permissibly reach organizations that have the primary objective of “influencing elections.” Ante at 290. It is inexplicable how, given this (correct) understanding, the majority can then limit the political committee definition only to organizations sponsoring communications that either use the magic words or comply with both BCRA’s requirements and the WRTL II test. In limiting the political committee definition to those groups involved in sponsoring express electoral advocacy, according to § 163-278.14A, North Carolina has developed a more narrowly tailored political committee definition than that required by the Supreme Court. Thus, § 163-278.14A(a)(2) is not overly broad as it applies to the definition of political committee.
Second, the Act imposes several different types of reporting and disclosure requirements when money is spent to “support or oppose” a candidate. Candidates, political committees, and referendum committees must regularly report their contributions and expenditures, unless these are less than $3000 for an election cycle. § 163-278.7, .9, ,9A, .10, 10A, .11. Individuals must periodically report contributions or independent expenditures exceeding $100. § 163-278.12. In addition, all advertisements funded through contributions or expenditures must contain certain disclosures about their sponsors and the candidates they support, unless they are funded through an independent expenditure from an individual who has spent less than $1000 in the election cycle. § 163-278.38Z, .39, .39A, .39C. Disclosure of funding information related to communications that “support or oppose the nomination or election of one or more clearly identified candidates” does not prohibit speech. See McConnell, 540 U.S. at 201, 124 S.Ct. 619. Nor have plaintiffs offered any evidence that such disclosure subjects them to threats or reprisals. See McConnell, 540 U.S. at 197-99, 124 S.Ct. 619; Buckley, 424 U.S. at 69-74, 96 S.Ct. 612. Disclosure requirements do burden (rather than prohibit) speech. The Act’s disclosure requirements, as circumscribed by § 163— 278.14A(a)(2), only cover campaign-related contributions and expenditures, not pure issue advocacy. Disclosure of campaign-related financing has a substantial relationship to the accepted governmental interests of “providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restric *324 tions.” McConnell, 540 U.S. at 196, 124 S.Ct. 619; see Buckley, 424 U.S. at 66-68, 96 S.Ct. 612. Furthermore, even if § 163— 278.14A(a)(2) did encompass more speech than that allowed by the WRTL II test, the Supreme Court has not adopted that test for disclosure requirements and, indeed, has approved of disclosure requirements for otherwise constitutionally protected speech. See Cal. Pro-Life Council, 507 F.3d at 1177 n. 4; Citizens United, 530 F.Supp.2d at 281 (citing MCFL, 479 U.S. at 259-62, 107 S.Ct. 616; Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley, 454 U.S. 290, 297-98, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981); First Nat’l Bank of Boston v. Bellotti, 435 U.S. 765, 791-92 & n. 32, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)); see also Cal. Pro-Life Council, 507 F.3d at 1181 (approving disclosure provision that allows regulators to consider “the surrounding circumstances” to determine whether “a payment” was “made ... [f]or the purpose of influencing ... the action of voters for or against the ... election of a candidate”). As a result, § 163-278.14A(a)(2) is not overbroad in its application to disclosure requirements.
Third, the Act imposes a $4000 cap on contributions to candidates or political committees, and the same limit on contributions from a political committee, for each election cycle. § 163-278.6(6), 13.[5] As the Supreme Court has recognized, contribution limits “impose[ ] only ‘a marginal restriction upon the contributor’s ability to engage in free communication.’ ” McConnell, 540 U.S. at 120, 124 S.Ct. 619 (quoting Buckley, 424 U.S. at 20-21, 96 S.Ct. 612). North Carolina defines “contribution” as payment of “anything of value whatsoever, to a candidate to support or oppose the nomination or election of one or more clearly identified candidates, to a political committee, to a political party, or to a referendum committee.” § 163— 278.6(6). Thus, the limits only cover contributions for clear electoral advocacy under the objective test in § 163-278.14A and contributions to or from a group that is focused on engaging in this type of advocacy (again defined by § 163— 278.14A). Because the limits on money given to support clear electoral advocacy bear a substantial relationship to the governmental purpose of preventing corruption and the appearance thereof, and only marginally burden speech, these limits are constitutional. Indeed, the Supreme Court has upheld limits on “contributions” defined much more broadly than the term in the North Carolina Act. See Buckley, 424 U.S. at 23-35, 96 S.Ct. 612 (upholding limit on “contributions” defined as “[fjunds provided to a candidate or political party or campaign committee either directly or indirectly through an intermediary!), or] dollars given to another person or organization that are earmarked for political purposes,” 424 U.S. at 24 n. 24, 96 S.Ct. 612); McConnell, 540 U.S. at 170, 124 S.Ct. 619 (upholding contribution caps for a “public communication that promotes or attacks a clearly defined candidate”); see also Fed. Election Comm’n v. Beaumont, 539 U.S. 146, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) (upholding a ban on any contributions from NCRL’s general treasury). Thus, the use of § 163-278.14A(a)(2) in defining contribution is not overly broad.
Fourth, the Act makes it “unlawful for any corporation, business entity, labor union, professional association or insurance company” to (1) “make any expenditure to support or oppose the nomination or elec *325 tion of a clearly identified candidate” or (2) “make any contribution to a candidate or political committee.” § 163-278.19(a)(l). The provision excepts segregated funds of these entities, incorporated political committees, and non-profit, non-shareholder corporations that have an educational or social mission. § 163-278.19(b), (f), (g). NCRL (a non-profit) and its segregated funds — North Carolina Right to Life Political Action Committee (NCRL-PAC) and North Carolina Right to Life Committee Fund for Independent Political Expenditures (NCRL-FIPE) — are thus clearly excluded from the reach of this provision. As a result, the plaintiffs in this case cannot allege any “injury in fact” and thus do not have standing to challenge § 163— 278.14A as it is used to define the reach of § 163-278.19. See McConnell, 540 U.S. at 225-30, 124 S.Ct. 619. Nonetheless, ignoring this threshold jurisdictional requirement, the majority strikes down North Carolina’s regulation of corporate and union spending on electoral advocacy that avoids the use of the magic words.[6]
The majority claims that I give “short shrift” to WRTL II in this analysis. Ante at 297. However, as I explained above, every court that has considered the application of WRTL II outside the expenditure limit context has determined that WRTL II is not relevant when considering contri-button limits, political committee regulations, or disclosure requirements. See supra at 297. There is good reason that these courts have recognized WRTL ITs limited applicability. The Supreme Court has consistently distinguished expenditure limits, which impose a direct restraint on speech and therefore are subject to strict scrutiny, from other campaign finance regulations that do not directly limit speech and thus are subject only to intermediate scrutiny. Further, despite the majority’s assertions, even if WRTL II did apply (which it does not), the majority misstates the WRTL II test as requiring “the bright-line requirements of BCRA § 203.” Ante at 297 (internal quotation marks omitted). Thus, the majority is correct that I “never claim[ ] that § 163-278.14A(a)(2) meets [the majority’s] standard.” Id. at 297. I do not apply this standard because, for the many reasons I have outlined above, it is both unsupported and irrelevant to the challenge before us today.
The majority further complains that I am “unable to identify a single case that has upheld a definition of the ‘functional equivalent of express advocacy’ as broad as § 163-278.14A(a)(2) since the Supreme Court’s WRTL [II] decision.” Ante at 299. I, like the majority, have cited no cases applying WRTL II’s test for a simple *326 reason: no court has applied this test beyond its context — an as-applied challenge to a direct expenditure limit. See Citizens United, 580 F.Supp.2d at 278-80 (determining, as the only court after WRTL II to apply the test, that an advertisement qualified as the functional equivalent of express advocacy and was properly prohibited under BCRA); see also supra at 316-17. Thus, the majority is also unable to identify a single case that has taken the extreme measure of striking down a portion of a contribution, political committee, or disclosure regulation as facially invalid using WRTL II’s functional equivalent test. Nor can the majority find cases prior to WRTL II that take such a drastic step. In contrast to the absence of authority for the majority’s position, I have cited decades of Supreme Court precedent that approves definitions at least as broad the one employed by North Carolina to clarify the reach of contribution, political committee, and disclosure regulations. See, e.g., McConnell, 540 U.S. at 170 & n. 64, 124 S.Ct. 619 (approving support or oppose language); MCFL, 479 U.S. at 249, 107 S.Ct. 616 (employing “essential nature” language); Buckley, 424 U.S. at 79, 96 S.Ct. 612 (approving definition of political committee as a group focused on “the nomination or election of a candidate”); id. at 24 n. 24, 96 S.Ct. 612 (approving definition of contribution as funds “that are earmarked for political purposes”). Simply put, the majority cites no relevant support for its conclusion because none exists.
In sum, the plaintiffs have failed to show that § 163-278.14A(a)(2) is overly broad on its face. The provision does not, on its face, cover a substantial amount of pure issue advocacy. Instead, its terms limit its application to communications that both “go [ ] beyond a mere discussion of public issues” and either expressly direct voters to take specific electoral action on behalf of “a clearly identified individual” or could, under an objective standard sanctioned by WRTL II, only be understood as urging specific electoral action. The provision limits North Carolina’s imposition of political committee regulations, disclosure requirements, contribution ceilings, and corporate contribution and expenditure restrictions to communications that direct voters to vote for or against a specific candidate in a specific campaign. The regulations that apply to the plaintiffs in this case only marginally burden speech, and they are justified by sufficient governmental interests, meeting the tests for constitutionality established by Buckley and McConnell. Nonetheless, the majority refuses to apply the test established by the Supreme Court and strikes the provision down as “patently overbroad” in all of its applications in this facial challenge. Ante at 300. The majority fails to provide any guidance for states attempting to regulate elections, noting instead that “[a]t some point ... enough is simply enough.” Ante at 302. But such vague and conclusory assessments are an insufficient basis for overturning the will of the people of North Carolina through a blanket invalidation of a statutory provision. Perhaps in rare instances the statute could prove to be unconstitutional in its application. But today’s case gives us no facts that would support such an as-applied challenge. Nor do the plaintiffs come close to carrying their heavy burden of showing that the regulation would chill a substantial amount of protected speech. Thus, I would hold § 163-278.14A(a)(2) constitutional on its face.
III.
The majority also holds that North Carolina’s definition of political committee unconstitutionally burdens political expression because it embraces organizations with “a major purpose” (rather than “the *327 major purpose”) of supporting or opposing a candidate. The majority holds that states must rigidly adhere to a formulation enunciated in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Buckley, however, only defined the outer limits of permissible political committee regulation when it held that regulation in this area (1) cannot cover “groups engaged purely in issue discussion” and (2) can cover groups “the major purpose of which is the nomination or election of a candidate.” Buckley, 424 U.S. at 79, 96 S.Ct. 612. Buckley left room for legislative judgment within these limits, so long as the resulting regulation does not prohibit a substantial amount of non-electoral speech. Because North Carolina’s definition of political committee does not cover “groups engaged purely in issue discussion” and gives organizations the option to create segregated funds to protect non-campaign related information, it has a substantial relationship to the several important governmental interests it serves. The definition is therefore constitutional.
A.
In Buckley the Supreme Court applied a narrowing construction to FECA’s definition of “political committee” in order to avoid concerns about constitutional vagueness and overbreadth. 424 U.S. at 79, 96 S.Ct. 612. Under FECA this term encompassed “ ‘any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000.’ ” Id. at 79 n. 105, 96 S.Ct. 612. Both “contributions” and “expenditures” were defined “in terms of the use of money or other valuable assets ‘for the purpose of ... influencing’ the nomination or election of candidates for federal office.” Id. at 77, 96 S.Ct. 612. Once designated a political committee, a group was subject to registration and reporting requirements similar to those imposed by the North Carolina Act. See id. at 60-63, 96 S.Ct. 612; N.C. Gen.Stat. § 163-278.7, .8, .9, .11, .13; see also N.C. Right to Life, Inc. v. Bartlett (NCRL I), 168 F.3d 705, 712 (4th Cir.1999).
FECA did not define the phrase “for the purpose of influencing.” See Buckley, 424 U.S. at 77, 96 S.Ct. 612. Because the definition of political committee incorporated this phrase, the Court expressed concern that “groups engaged purely in issue discussion” would be encompassed in the definition of political committee and subjected to regulation. Buckley, 424 U.S. at 79, 96 S.Ct. 612. Accordingly, it adopted a narrowing construction of the term “[t]o fulfill the purposes of the Act.” Id. Thus, the Court construed the definition to “only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate.” Id. With the definition of political committee so construed, the definition of “expenditure” did not need to be interpreted narrowly in the context of political committee disclosure requirements because the political committee expenditures were, “by definition, campaign related.” Id. Given the Supreme Court’s interpretation, the definition of political committee was not unconstitutionally vague; nor was the disclosure law overly broad because it served substantial governmental interests in enforcing the contribution limits, deterring corruption and the appearance thereof, and providing valuable information to voters. Id. at 76-82, 96 S.Ct. 612.
NCRL argues that, in order to ensure that North Carolina’s regulations are not vague or overly broad, the state must adopt word for word the language suggested by Buckley. Thus, the North Carolina legislature violated the Constitution by *328 drafting the statute to require that election activity be “a major purpose” of an organization rather than “the major purpose.” The majority errs in its wholesale adoption of this argument. As I will explain, Buckley did not establish a bright line rule; rather, it established parameters that were adhered to by the North Carolina legislature.
B.
Unlike the definition of “political committee” in Buckley, the North Carolina Act’s definition of the term is clear on its face. The Act defines “political committee” as
a combination of two or more individuals ... that makes, or accepts anything of value to make, contributions or expenditures and has one of the following characteristics:
a. Is controlled by a candidate;
b. Is a political party or executive committee of a political party or is controlled by a political party or executive committee of a political party;
c. Is created by a corporation, business entity, insurance company, labor union, or professional association pursuant to G.S. 163-278.19(b); or
d. Has as a major purpose to support or oppose the nomination or election of one or more clearly identified candidates.
N.C. Gen.Stat. § 163-278.6(14).
The majority argues that the use of “a major purpose” rather than “the major purpose” in § 163-278.6(14)d renders the statute unconstitutionally vague because, although regulators and speakers can easily determine “the major purpose” of an organization, they are left “with absolutely no direction” as to how to determine “a major purpose” of an organization. Ante at 289. The majority reasons that groups and regulators can determine what is “the major purpose” of an organization by considering whether it “explicitly states in its by-laws or elsewhere, that influencing elections is its primary objective, or if the organization spends the majority of its money in supporting or opposing candidates.” Ante at 289. Of course, consistent with Federal Election Commission v. Massachusetts Citizens for Life (.MCFL), 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), the majority does not specify these factors as the only ones a regulator may consider in determining “the major purpose” of an organization. Ante at 289 n. 6; see MCFL, 479 U.S. at 241-42, 252 n. 6, 262, 107 S.Ct. 616 (concluding that the plaintiffs “central organizational purpose [was] issue advocacy,” based on its articles of incorporation, the sources of its funding, its activities, and how extensive its campaign related spending was). Thus, a regulator’s determination of “the major purpose” of an organization allows for a fact specific analysis of a group’s organizational documents, its finances, its activities, and other relevant factors. The majority fails to explain why this same analysis would be appreciably more difficult for a regulator to apply in determining whether electoral advocacy is “a major purpose” of an organization.
It is clear that the same analysis can be used for both phrases. The key word providing guidance to both speakers and regulators in “the major purpose” test or “a major purpose” test is the word “major,” not the article before it. “Major” means “notable or conspicuous in effect or scope: considerable, principal.” Webster’s Third New Int’l Dictionary 1363 (2002). Thus, regardless of whether a regulator is identifying “a major purpose” or “the major purpose” of an organization, the regulator considers the same evidence to determine whether *329 electoral advocacy constitutes a considerable or principal portion of the organization’s total activities.
Likewise, an organization is just as able to determine whether electoral advocacy comprises one of its major purposes as it is able to determine whether such activity is “the major purpose.” NCRL confirmed its own ability to make this determination at oral argument, when its counsel emphatically stated that advocacy for a candidate was not any of its major purposes. And, again, if a group is concerned about how it might be categorized, the North Carolina Act makes binding advisory opinions available. § 163.278.23; see McConnell v. Fed. Election Comm’n, 540 U.S. 93, 170 n. 64, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003); Buckley, 424 U.S. at 40 n. 47, 96 S.Ct. 612. Thus, because North Carolina’s “a major purpose” test is just as clear as a “the major purpose” test to both speakers and regulators, it is not unconstitutionally vague.
C.
In addition, the substitution of “a” for “the” in Buckley’s major purpose test does not expand the reach of the Act in any way that overly burdens First Amendment freedoms. In arriving at the major purpose test to avoid overbreadth, Buckley expressed concern that requiring disclosure of expenditures (broadly defined) by “groups engaged purely in issue discussion” would not serve the campaign-related purposes of FECA. 424 U.S. at 79, 96 S.Ct. 612. Instead of conducting the same sort of overbreadth analysis used in Buckley, which gives proper deference to other branches of government, the majority again applies a new, rigid requirement: all state political committee definitions must adopt, word for word, Buckley’s definition of such a committee.
The substitution of “a” for “the” in the political committee definition would only render the definition unconstitutional if it resulted in limiting a substantial amount of pure issue advocacy.[7] As an initial matter, North Carolina’s political committee regulations require a committee to designate a treasurer to keep accurate financial records, make regular periodic disclosures of income and disbursements if it receives or spends more than $3000 during an election, and limit each political contribution it receives or makes in an election cycle to $4000. § 163-278.7 to .11. While these regulations may impose substantial obligations in the administration of a political committee, NCRL I, 168 F.3d at 712, under Supreme Court precedent they impose only marginal restrictions on speech, see McConnell, 540 U.S. at 201, 124 S.Ct. 619; Buckley, 424 U.S. at 20-21, 96 S.Ct. 612. Of course, even marginal restrictions on speech may not be imposed on pure issue advocacy groups, because those restrictions would not serve important governmental interests. Buckley, 424 U.S. at 79, 96 S.Ct. 612. But North Carolina’s “a major purpose” test runs little risk of encompassing pure issue advocacy groups or discouraging non-campaign related speech. First, as I have discussed, North Carolina requires that direct campaign advocacy be “a major purpose” of the group. NCRL I, 168 F.3d at 712. Heeding our holding in NCRL I, the state was careful to exclude organizations with only “incidental” cam *330 paign related purposes. Id. Further, the definition of political committee can not possibly cover organizations engaging solely in issue advocacy; instead, the organization must focus a considerable or principal amount of its activities on campaigning for or against a clearly defined candidate before those activities become a major purpose of the organization. See Webster’s Third New Int’l Dictionary 1363.
Furthermore, North Carolina’s contribution limits and disclosure requirements create lesser burdens on speech than other requirements that have been upheld by the Supreme Court. The Supreme Court has approved a ban on any political contributions from issue-based non-profit corporations. Fed. Election Comm’n v. Beaumont, 539 U.S. 146, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003). Such a ban imposes a far greater burden than subjecting a group with “a major purpose” of electioneering to disclosure requirements and contribution limits.[8] Additionally, as Beaumont advised, organizations that meet the “a major purpose” test can avoid disclosure requirements and contribution limits on non-campaign related work by creating segregated political committees, such as NCRL has done with NCRL-PAC and NCRL-FIPE. The regulations would not reach the parent organization in this circumstance because at most it would only engage in an incidental amount of electoral advocacy.
The majority also argues that the “a major purpose” language over-burdens issue advocacy groups because it forces them to divulge information to defend against political committee designation. Ante at 290. However, the substitution of “a” for “the” in the test poses no greater burden on an organization defending against political committee designation. Under either formulation, an organization must divulge the same type of information with respect to purpose in defending against designation.
Furthermore, North Carolina has important interests in regulating political parties with a major purpose of electoral advocacy. Again, these interests include preventing corruption and the appearance of corruption in the electoral process, providing information to voters, and providing data to regulators to assist with enforcement of the law. See supra at 309-10. North Carolina’s political committee definition is closely drawn to these interests. In tailoring its statute, North Carolina heeded Buckley’s, concern that regulation of “groups engaged purely in issue discussion” would not be sufficiently correlated to the governmental interests that justify regulation. See Buckley, 424 U.S. at 79, 96 S.Ct. 612. Thus, North Carolina’s statute, which only regulates organizations with a major campaign-related purpose, is closely tailored to governmental interests.[9]
In fact, the Act is tailored to address a fundamental organizational reality. As NCRL’s counsel concedes, most organizations — including NCRL — do not have just one major purpose. For example, NCRL states that its two major purposes are educating to promote life and lobbying at *331 the state and national levels and its minor purpose is occasionally supporting or opposing specific candidates. Because NCRL’s campaign-related activities are incidental to its overall activities, it would not be subject to regulation as a political committee. On the other hand, some other organization might spend forty-five percent of its resources on lobbying and forty-five percent of its resources on supporting or opposing specific candidates. The purposes of the contribution limits and disclosure provisions of the Act — providing information to voters, preventing corruption and the appearance thereof, and enforcing the other provisions of the Act — are closely tied to regulating such an organization because it must be heavily focused on electoral advocacy to have that activity constitute one of its major purposes.
The majority argues that North Carolina should employ “narrower means ... to achieve its regulatory objective,” namely, requiring what it characterizes as “onetime reporting” of campaign-related expenditures and conti’ibutions for all organizations unless they meet the “the major purpose” test. Ante at 290. But the majority errs in requiring North Carolina to employ the least restrictive means of achieving its goals. The narrow tailoring analysis does not apply to the political committee regulations at issue here (disclosure and reporting requirements and contribution limits); under Buckley the state must only show “relevant correlation” between its interests and the regulation. See Buckley, 424 U.S. at 64, 78-79, 96 S.Ct. 612 (quotation marks omitted); see also McConnell, 540 U.S. at 136, 124 S.Ct. 619. Thus, the “possibility” of “less restrictive means” suggested by the majority, ante at 304, does not defeat North Carolina’s regulation. Moreover, this tepid requirement would not be sufficiently correlated with the state’s interest. It is a minimalist approach for regulating organizations with a major purpose of electoral advocacy; it would significantly undermine the state’s interest in data collection and deterrence because it would allow these organizations to avoid the careful accounting and regular reporting requirements that enable the state to undertake prompt investigation of incidents of potential misconduct. See Buckley, 424 U.S. at 59-68, 96 S.Ct. 612. Furthermore, the majority’s holding also strikes down on their face the contribution limits imposed by § 163-278.13 for organizations that fit the “a major purpose” test. The state has a clear interest in limiting extremely large contributions to organizations that then spend that money on direct electoral advocacy. See Buckley, 424 U.S. at 23-35, 96 S.Ct. 612 (upholding limit on “dollars given to another person or organization that are earmarked for political purposes,” 424 U.S. at 24 n. 24, 96 S.Ct. 612). The majority’s suggestion that groups with a major purpose of electioneering be subjected only to minimal reporting requirements (and no contribution limits) would be ineffective and would defeat the state’s important interests in regulating electoral advocacy.
North Carolina’s political committee definition establishes limits on contributions and requires disclosures by organizations centrally engaged in electoral advocacy. To the extent that the regulations impact an organization’s issue advocacy by requiring disclosure of all donor information and financial receipts and disbursements and by imposing limits on all contributions to it, the regulations encourage groups to set up separate political committees for their electoral advocacy. The availability of this option both limits any burden on a group’s issue advocacy and furthers the state’s interest in transparency in electoral advocacy. See Beaumont, 539 U.S. 146, 123 S.Ct. 2200 (upholding federal ban on contributions from NCRL, with the alterna *332 tive of a segregated fund). Not only does the majority ignore this option entirely, but its holding also actively discourages this positive approach. The majority effectively encourages advocacy groups to circumvent the law by not creating political action committees and instead to hide their electoral advocacy from view by pulling it into the fold of their larger organizational structure. When electoral advocacy comprises “a major purpose” of the organization rather than the organization’s only purpose, the organization can avoid the bookkeeping requirements, regular reporting, and contribution limits imposed on political committees. This result is decidedly not required by the First Amendment.
North Carolina has devised a standard that addresses organizational reality and is careful not to frustrate issue advocacy or general political speech. The statute only reaches organizations with direct electioneering as a major purpose and leaves options that allow those organizations to avoid regulation of any of their pure issue advocacy. Because the provision restricts issue advocacy even less than regulations approved by the Supreme Court and is closely matched to important governmental interests, I would hold it constitutional on its face.
IV.
The majority also strikes down the Act’s $4000 contribution limit insofar as it applies to “independent expenditure political committees” such as NCRL-FIPE.[10] In taking this drastic step, the majority adopts a “crabbed view of corruption, and particularly of the appearance of corruption.” See McConnell v. Fed. Election Comm’n, 540 U.S. 93, 152, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003).
In contrast to its other two holdings, the majority avoids the temptation to create some new rigid rule for contribution limits. But, while the majority properly states the overbreadth test, it strikes down the contribution limit by relying on our vacated decision in North Carolina Right to Life, Inc. v. Leake (.NCRL II), 344 F.3d 418 (4th Cir.2003), and ignoring the Supreme Court’s recent decisions. As the majority recognizes, contribution caps are subject only to heightened scrutiny (rather than strict scrutiny) because they do not directly limit the donor’s speech and do not preclude association. McConnell, 540 U.S. at 134-36, 124 S.Ct. 619; Buckley v. Valeo, 424 U.S. 1, 20-23, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Instead, they allow organizations to receive (substantial, in this case) contributions from individual donors and to make expenditures of any amount they wish. Thus, contribution limits are permissible if they are “closely drawn to match a sufficiently important interest.” McConnell, 540 U.S. at 136, 124 S.Ct. 619 (internal quotation marks omitted). In this context, the Supreme Court has recognized important governmental interests in preventing corruption, the appearance of corruption, and circumvention of election regulations. Id. at 136-37, 144, 185, 124 S.Ct. 619. The greater the novelty of the state’s justification, the more evidence it must provide to support the regulation. Id. at 144, 124 S.Ct. 619.
The majority quotes our vacated opinion in NCRL II in concluding that North Carolina’s concerns about the corruptive influence of contributions to independent expenditure committees are “ ‘implausible.’ ” Ante at 293 (quoting NCRL II, 344 F.3d at *333 434). In light of the Supreme Court cases decided after our last opinion, I disagree with this assessment. McConnell requires courts to accept as plausible that corruption can extend beyond the “quid pro quo corruption inherent in” contributions and expenditures expressly coordinated with a candidate. 540 U.S. at 152, 124 S.Ct. 619 (internal quotation marks omitted). Courts should allow legislatures to address corruption or the appearance thereof that is indicated by factors such as the “size [of the contribution or expenditure], the recipient’s relationship to the candidate or officeholder, [the contribution’s or expenditure’s] potential impact on a candidate’s election, its value to the candidate, or its unabashed and explicit intent to purchase influence.” Id.
McConnell found support for this expanded understanding of corruption in, among other cases, California Medical Ass’n v. Federal Election Commission (Cal-Med), 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). Cal-Med upheld a provision of FECA in response to a facial overbreadth challenge. As McConnell explained, the FECA provision “restricted ... the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures.” 540 U.S. at 152 n. 48, 124 S.Ct. 619. In his concurrence in Cal-Med Justice Blackmun stated that the provision would likely be unconstitutional if applied to groups making independent political expenditures rather than groups that coordinate their expenditures with a candidate. Cal-Med, 453 U.S. at 203, 101 S.Ct. 2712 (Blackmun, J., concurring). McConnell rejected Justice Blackmun’s reasoning, explaining that Cal-Med held the FECA provision constitutional on its face, even though the provision clearly imposed limits on contributions for independent political expenditures. 540 U.S. at 152 n. 48, 124 S.Ct. 619. In other words, if the governmental interests only justified regulation of coordinated expenditures — as Justice Blackmun argued — the statute would have been facially overbroad (and therefore unconstitutional) because it imposed limits on all groups making expenditures. Id. But Cal-Med held that the provision was not facially overbroad, so (according to McConnell) the First Amendment must allow legislatures to regulate contributions to fund independent political expenditures. Id. Despite McConnell’s clear rejection of the majority’s reasoning in this case, the majority relies on Justice Blackmun’s concurrence in Cal-Med rather than the Supreme Court’s recent statement of the law and reading of its precedent. Ante at 292.
While ignoring McConnell’s interpretation of CaV-Med and its approach to corruption, the majority relies on out-of-context quotes from McConnell to support its contention that the Court “views political parties as different in kind than independent expenditure committees.” Ante at 293. The language quoted by the majority is taken from a portion of McConnell that addresses an equal protection challenge to BCRA provisions that regulate only political parties (a subset of political committees) and not “special interest groups.” McConnell, 540 U.S. at 187-88, 124 S.Ct. 619. The Court stated that Congress was “fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation.” Id. at 188, 124 S.Ct. 619. Thus, the Court allowed Congress to make reasonable distinctions in the drafting of regulations. The Court did not, however, mandate that all legislatures reach the same conclusions as Congress about the difference between political parties and interest groups (or for that matter the difference between political committees and independent expenditure *334 groups). Nor did the Court mandate that all legislatures draw lines of distinction in exactly the same way.
Indeed, as described above, McConnell recognized the “more subtle but equally dispiriting forms of corruption” that could result from backdoor involvement of formally “independent” individuals and groups in the federal political process— even without explicit coordination with candidates. Id. at 153-54, 124 S.Ct. 619. The legislature, with its strong interest in avoiding circumvention of the law, thus has the right to make reasonable predictions and adopt prophylactic measures. Id. at 185, 124 S.Ct. 619; Fed. Election Comm’n v. Beaumont, 539 U.S. 146, 159, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003). Within these parameters, McConnell rejected overbreadth challenges to federal regulation of groups and individuals that operated independently from federal candidates. Id. at 154-56 (upholding limits on contributions to federal political parties), 162-73 (upholding limits on contributions to state and local political parties), 174-81 (upholding a ban on party solicitations for, and contributions to, tax-exempt organizations), 184-85, 124 S.Ct. 619 (upholding restrictions on state candidates and officeholders).
Because of the Supreme Court’s awareness of the influence brought to bear on federal campaigns by groups making independent expenditures, McConnell only required “substantial evidence” to support Congress’s concern about corruption caused by contributions to state and local party committees, candidates, and officeholders that were formally independent from the federal campaigns. 540 U.S. at 154, 124 S.Ct. 619; see id. at 164-65, 176-77, 185, 124 S.Ct. 619. McConnell thus recognizes the plausibility of legislative concerns that contributions to fund independent expenditures can lead to the appearance of corruption in the electoral process. McConnell’s broader view of corruption means that our reasoning in NCRL II, a decision that the Court vacated and remanded for reconsideration in light of McConnell, no longer stands on firm ground. North Carolina’s regulation of all political committees (whether formally coordinated or independent) is similar to BCRA’s regulation of independent individuals and groups, and the reason for regulation — the potential for corruption or the appearance thereof — is likewise similar. Because McConnell recognizes that North Carolina’s proffered justification for its regulation is plausible, the state must only produce substantial evidence to support its position.
North Carolina has provided a thorough record of the threat of corruption, the appearance of corruption, and the circumvention of election laws that attend the operation of independent expenditure committees. This evidence is sufficient to satisfy the state’s burden of showing substantial evidence. The state shows that a vast amount of campaign funding at the national level has shifted from party committees to so-called independent committees. Moreover, the evidence shows that contributors to these independent committees still expecU — and have reason to believe — that their contributions will gain them special access to elected officials and allow them to influence the political process. Thomas E. Mann, a respected senior fellow at the Brookings Institution, explains in his declaration the pervasive influence of independent committees and those who fund them, using the 2004 federal campaigns as an example:
The [national] parties’ IEPC [Independent Expenditure Political Committee] strategies were similar. They encouraged people closely and visibly associated with them to form and op *335 erate officially independent IEPCs, which the party through its officials and leading members could then identify to donors as appropriate funding vehicles. Those IEPCs could, in turn, because of their management by people so intimately familiar with the needs and aims of the party effectively aid a campaign without any formal coordination. The risk for any donors seeking access and influence was slight. Who contributed was a matter of public knowledge and their money would bé, so far as the party itself was concerned, well spent.
IEPC activities can undermine democratic politics by creating corruption or the appearance of corruption. Some contributions are so large ... that they would certainly be remembered vividly by party officials and cast doubt in the public’s eye that the contributor enjoyed no special influence over or access to the party and its candidates. Spending by IEPCs, moreover, greatly benefits federal candidates and thus has great value to them. Nothing suggests, in fact, that it is much less effective than spending by the parties themselves. Given the close ties between those who manage the most influential IEPCs ... and the major political parties and their candidates, actual coordination between the IEPCs and the parties and candidates is unnecessary.
J.A. 325-26.
The campaign waged in North Carolina by the independent group Farmers for Fairness (Farmers) provides another example of the corruptive influence of independent expenditures. Farmers created advertisements directly opposing certain legislative candidates. Instead of simply running the advertisements during election time, Farmers scheduled meetings with legislators and screened the advertisements for them in private. Farmers then explained that, unless the legislators supported its positions, it would run the advertisements that attacked the candidates on positions unrelated to those advocated by Farmers. The majority interprets this activity as the “group feel[ing] passionately about an issue and discussing] it.” Ante at 294. This could not be further from reality. The record reveals that Farmers did not discuss its central issue, deregulation of the hog industry, in its advertisements. Instead, it threatened and coerced candidates to adopt its position, and, if the candidate refused, ran negative advertisements having no connection with the position it advocated. This activity is not “pure political speech,” ante at 305; it is an attempt to use pooled money for behind-the-scenes coercion of elected officials. The majority also opines that inasmuch as Farmers discussed its intention to run the advertisements with the candidates, their activities were coordinated. Ante at 294-95. This is simply wrong. A threat cannot qualify as coordination because the targeted candidate would not be willingly cooperating if he or she chose to surrender to the demands of the Farmers group. If the candidate chose not to surrender, and Farmers then made good on its threat to broadcast negative advertisements, it is equally clear that the candidate would not have directed or otherwise cooperated with the airing of the advertisement. The Farmers example shows exactly how independent expenditures can create the same appearance of corruption and potential for actual corruption as do excessively large contributions. The only difference between these two methods (other than, after today’s decision, that one may be regulated and the other may not) is that the independent expenditures made by Farmers had the potential to influence candidates through threats and reprisals, while excessively *336 large direct contributions have the potential to influence candidates by rendering them beholden to the donor. In short, the method may differ, but the corrosive effect on the electoral process remains the same.
These examples are certainly not exhaustive. The record contains hundreds of pages of testimony and reports supporting the judgment of the North Carolina legislature that independent expenditure political committees are sufficiently harmful to the electoral process to justify the $4000 contribution limit.[11] All of these examples show that North Carolina has an important interest in limiting the corruption or appearance of corruption that can stem from large contributions to independent committees with significant informal ties to coordinated committees, political parties, and candidates. The evidence shows that independent expenditures can have a large “potential impact on a candidate’s election,” and are of great “value to the candidate,” even if the committee does not take any direction from a candidate. See McConnell, 540 U.S. at 152, 124 S.Ct. 619.
The organizational structure of the plaintiffs in this case further illustrates the legitimacy of North Carolina’s concerns about allowing independent expenditure committees to receive unlimited contributions. As the majority notes, NCRL-FIPE is an entity legally separate from NCRL and NCRL-PAC, with the mission of making uncoordinated expenditures. Ante at 294 n. 8. However, NCRL-FIPE shares facilities, directors, staff, and other resources with NCRL and (especially) NCRL-PAC. Executive meetings and board meetings address issues for all of the various NCRL groups, and the same officers plan strategy and activities and raise funds for all of the NCRL entities. While NCRL-FIPE does not officially coordinate its expenditures with candidates, NCRL and NCRL-PAC do coordinate expenditures with candidates and make direct contributions. Thus, at any given moment, the same director or staffer is on the one hand ensuring that NCRL-PAC’s activities follow a candidate’s campaign strategy, while on the other hand “independently” designing NCRL-FIPE’s expenditure strategy to promote that same candidate. It is hard to understand how NCRL-FIPE could, whether intentionally or not, avoid incorporating the coordinated campaign strategies used by NCRL-PAC into its own ostensibly independent campaign work. Similarly, it is hard to understand how a donor, approached by the same fundraiser on behalf of both NCRL-PAC and NCRL-FIPE, could not believe that his or her contributions to each would be linked. I do not argue that we should “pierce the corporate veil,” ante at 294 n. 8, or that “NCRL has abused its corporate form,” ante at 306; the corporate structure here is legitimate. However, under the majority’s new rule of constitutional law, organizations are given an explicit green light to use the legal loophole created by today’s holding to circumvent campaign finance regulation. The majority’s rule exempts from contribution limits NCRL-FIPE and all other independent expenditure committees that are closely intertwined with politically connected groups. The majority’s decision enables political advocacy groups to create funds through which they can funnel unlimited campaign contributions after large donors *337 have exhausted their ability to contribute directly to candidates or political committees. This approach is a complete rejection of the important governmental interest in limiting the influence of money in politics to prevent the appearance and reality of corruption. The majority’s approach also strips the legislature of its right “to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process.” McConnell, 540 U.S. at 137, 124 S.Ct. 619.
North Carolina has provided substantial support for its interest in regulating contributions to independent expenditure political committees. The regulation is closely drawn to match the state’s interest. The contribution limits are quite accommodating — each individual donor may give up to $4000 to NCRL-FIPE for each election. Much lower contribution limits have been approved by the Supreme Court. See Randall v. Sorrell, 548 U.S. 230,-, 126 S.Ct. 2479, 2493, 165 L.Ed.2d 482 (2006) (listing state and federal contribution limits). The majority argues that the regulations would “silence” speech. Ante at 305-06. But the law does not limit in any way NCRL-FIPE’s ability to engage in political speech; it can amass as much funding as it pleases and spend it all on campaign advertisements.[12] The regulation allows it to expand its donor base to gather additional funds — a prospect that should invigorate, not detract from, public engagement in the political sphere. See McConnell, 540 U.S. at 140, 124 S.Ct. 619. Nor is the speech of its donors particularly limited by the regulation. They still may donate, repeatedly, large sums of money to use on independent expenditures (and donate again to NCRL-PAC the same amount for use as candidate contributions). And they can continue to associate with an organization that supports their ideals and their political agenda. See McConnell, 540 U.S. at 141, 124 S.Ct. 619; Buckley, 424 U.S. at 22, 96 S.Ct. 612.
In sum, the majority ignores the import of McConnell and instead relies on our vacated opinion to characterize North Carolina’s interest in the regulation as implausible. By resurrecting our vacated reasoning, the majority places an improperly heavy evidentiary burden on North Carolina, rather than only requiring it to show the substantial evidence necessary after McConnell. North Carolina has provided substantial evidence of the corruptive influence of independent expenditures, justifying its contribution limit for all political committees. Because the $4000 limit on contributions for each contributor for each election to each independent expenditure committee is closely drawn to the important governmental interest of preventing the reality and appearance of corruption, I conclude that § 163-278.13 is constitutional as applied to NCRL-FIPE and similarly situated groups.
V.
The State of North Carolina has, within constitutional bounds, enacted a campaign finance law that (1) provides an appropriate test for determining whether an advertisement “support [s] or oppose[s] a clearly identified candidate,” N.C. Gen.Stat. § 163-278.14A(a)(2); (2) properly defines a political committee as one that has electoral advocacy as “a major purpose,” § 163-278.6(14)d; and (3) imposes dollar limits on contributions to independent political com *338 mittees, § 163-278.13, that are fully justified by substantial evidence of the corrupting influence of independent expenditures in today’s politics.
In striking down these provisions, the majority relies almost exclusively on its view that campaign finance regulations are inherently suspect because they directly threaten the “ordinary political speech that is democracy’s lifeblood.” Ante at 284. According to the majority, enforcement of North Carolina’s regulations would subject political speech to “layer upon layer of intense regulation,” giving states “nearly unbridled discretion to allow or disallow political messages based, inter alia, on the regulator’s own preferences and predilections.” Ante at 296. The majority sees “ungovernable complexity” in the regulations that would serve as “a lexicon of bureaucratic empowerment” and would require potential speakers to “hire the best team of lawyers” to “figure out” how to escape penalties for violations. Ante at 296, 298, 297. Further, the majority asserts, North Carolina’s regulations would “serve as a front for incumbency protection” and “silence [organizations] through regulation,” thereby “slowly ridding our democracy of one of its foremost cleansing agents.” Ante at 306. The majority concludes that I “replaee[ ] ... faith in the workings of the First Amendment with a faith in the powers of government to manage what we say on what matters most,” thereby “surrendering] to the state an awesome control over those political issues that determine the quality of our democracy and the values that give purpose and meaning to our lives.” Ante at 307-08.
The majority characterizes my expressed concerns as “hyperbolic” and “overblown,” ante at 296, 301, yet apparently sees no irony in making these doomsday-like predictions in support of its own position. My concerns are based on the realities of politics in North Carolina and elsewhere-realities that have been recognized by the Supreme Court, are documented in the record, and provided the basis for legislative action that culminated in passage of the Act. The majority’s grave predictions, on the other hand, have no historical foundation. Decades of campaign finance regulation have not silenced political speech or allowed government regulators to run amok and censor speech at whim. North Carolina’s Act is simply another effort at reasonable (and necessary) regulation. The Act is the result of the legislature fulfilling its duty to protect the political processes of the state from the undue influence of money. In stopping the state from enforcing key provisions of the Act, the majority severely hobbles the legislature’s authority to combat the appearance and reality of corruption in politics.
The majority’s approach, as reflected in the statements noted above, “takes a difficult constitutional problem and turns it into a lop-sided dispute between political expression and government censorship.” Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 399, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Breyer, J., concurring). The majority treats political contributions and expenditures as the equivalent of speech, thus concluding that the regulation of campaign finance restricts “pure political speech.” Ante at 298, 303, 305, 307. Indeed, the majority appears to favor the argument that “free political speech,” that is, political speech immune from campaign finance regulation, “is the best remedy for, rather than a cause of, corruption.” Id. at 306. This simplistic view of the First Amendment, while popular with some, has been expressly and consistently rejected by the Supreme Court since the time of Btickley. The Supreme Court has repeatedly held that the First Amendment *339 guarantee of free speech requires a balance between competing interests in the area of campaign finance regulation. On the one hand, the First Amendment protects the freedom of political expression and association; on the other hand, and no less fundamentally, it protects “the integrity of the electoral process” through which political speech is transformed into governmental action. Shrink Missouri, 528 U.S. at 400-01, 120 S.Ct. 897 (Breyer, J., concurring). Because campaign finance regulation “significantly implicates competing constitutionally protected interests in complex ways,” the courts (and legislatures) must balance those interests. Id. at 402, 120 S.Ct. 897. The majority’s First Amendment analysis misinterprets the nature of the interests on one side of the balance and completely fails to consider the other side.
First, “a decision to [spend money to support or oppose] a campaign is a matter of First Amendment concern — not because money is speech (it is not); but because it enables speech.” Id. at 400, 120 S.Ct. 897. The regulations at issue here — disclosure requirements, contribution limits, and political committee regulations — may affect speech, but they do not silence it, as Supreme Court precedent makes clear. North Carolina’s regulations would have little, if any, constraining effect on the average citizen interested in debating political issues or attempting to influence electoral outcomes. The contribution regulations limit amounts of money donated from each source, but they do not limit the amount of speech the donor or recipient may engage in; the disclosure and political committee regulations ensure an injection of more, not less, information about candidates’ support and positions into the public sphere. The majority’s parade of horri-bles notwithstanding, “the essential freedom ... to speak in unfettered fashion on the most pressing issues of the day,” ante at 296, remains vibrant and protected under the North Carolina regulations, because the regulations stop no one from speaking.
Second, the majority ignores the Supreme Court’s longstanding recognition that campaign finance regulations also serve the interest of preserving the vitality of our democratic institutions, which in turn serves the purposes of the First Amendment. As the Court has explained in the context of contribution limits, judicial evaluation of campaign regulations
reflects more than the limited burdens they impose on First Amendment freedoms. It also reflects the importance of the interests that underlie [regulation]— interests in preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption .... [T]hese interests directly implicate the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process. Because the electoral process is the very means through which a free society democratically translates political speech into concrete governmental action, contribution limits, like other measures aimed at protecting the integrity of the process, tangibly benefit public participation in political debate.
McConnell v. Fed. Election Comm’n, 540 U.S. 93, 136-37, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (quoting Fed. Election Comm’n v. Nat’l Right to Work Comm., 459 U.S. 197, 208, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982); Shrink Missouri, 528 U.S. at 401, 120 S.Ct. 897 (Breyer, J., concurring)) (internal quotation marks and citations omitted).
*340 The majority today fails to recognize this entire side of the constitutional equation and instead focuses exclusively on the First Amendment interest in protecting the right to spend money to influence politics. This one-sided approach has direct implications for the majority’s analysis. The majority treats all types of regulations as highly suspect, even though — because money is not the exact equivalent of speech — different types of regulations related to campaign financing impose varying burdens on protected activity. The majority thus fails to “show[ ] proper deference to [the legislature’s] ability to weigh competing constitutional interests in [this] area in which it enjoys particular expertise.” Id. at 137, 124 S.Ct. 619. Like Congress and the Supreme Court, North Carolina’s legislature has concluded that the unregulated use of money in politics is not, as “some may argue ... the best remedy for ... corruption.” Ante at 306. Instead, it has crafted election regulations that “provid[e] the electorate with relevant information about the candidates and their supporters” and combat “ ‘the corrosive and distorting effects of immense aggregations of wealth’ ” on the political process. McConnell, 540 U.S. at 121, 205, 124 S.Ct. 619 (quoting Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 660, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990)).
It is not our place to rewrite precedent, even if our beliefs about the First Amendment conflict with those of the Supreme Court. Instead, we should carefully and methodically apply precedent to determine whether North Carolina has overstepped its bounds. The majority sidesteps this process, relying instead on its instinct that “[a]t some point ... enough is simply enough.” Ante at 302. On the side of the balance protecting free expression, the majority is right that these regulations could — in some hypothetical case not before us today — affect political expression in an unconstitutional way. But under Supreme Court precedent we may not “go beyond the statute’s facial requirements and speculate about hypothetical or imaginary cases,” as the majority has done. Wash. State Grange v. Wash. State Republican Party,—=U.S.-,-, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (quotation marks omitted).
On the other side of the balance, the regulations protect the democratic process by publicizing information about the financial backers of political candidates through disclosure and reporting requirements; the contribution limits further promote broad-based political participation by encouraging candidates and political committees to expand their donor bases. As I have explained, without the Act’s clarifying definition of “support or oppose the nomination or election of one or more clearly identified candidates” in § 163— 278.14A(a)(2), those seeking to influence elections will continue to avoid contribution limits and disclosure requirements by thinly disguising their advertisements as issue discussion. As a result, voters will be deprived of valuable information about candidates’ supporters, and each donor will be allowed to inject unlimited amounts of money into the political process. Without the “a major purpose” political committee definition in § 163-278.6(14)d, organizations with electoral advocacy as a major purpose will continue to escape regular reporting, accounting, and contribution limits by rejecting transparency and blending their major political activity into their other work. And without the application of contribution limits to independent political committees through § 163-278.13, political groups -will continue to exert coercive influence over elected officials without any constraints on the size of contributions from individual donors.
*341 The North Carolina legislature concluded that, on balance, the First Amendment supports these limited and carefully drawn regulations. Nonetheless, without conducting its own balancing as required by precedent, the majority strikes down the provisions at issue today. The majority’s decision will not result in more speech or a more reasoned political discourse. Instead, the net result will be a less informed electorate and a step back toward a political system in which large donors call the tune. The plaintiffs have not carried their heavy burden of showing that the regulations lack “a plainly legitimate sweep.” Wash. State Grange, 128 S.Ct. at 1190 (quotation marks omitted); see also McConnell, 540 U.S. at 207, 124 S.Ct. 619. I would therefore reverse the judgment of the district court and remand with the direction that summary judgment be entered in favor of the defendants, the state officials in charge of elections in North Carolina.

. Such regulations can, however, pose an unconstitutional burden if those regulated are able to show evidence of threats or reprisals as the result of the disclosures. See McConnell, 540 U.S. at 197-99, 124 S.Ct. 619; Buckley, 424 U.S. at 69-72, 96 S.Ct. 612.

. Contributions to candidates for the state supreme court and court of appeals are capped at $1000. § 163-278.13(e2).

. Although the majority mentions one important governmental interest — " 'limiting] the actuality and appearance of corruption,’" ante at 281 (quoting Buckley, 424 U.S. at 26, 96 S.Ct. 612) — it fails to either conduct an over-breadth analysis or recognize the full range of governmental interests served by election regulations.

. Further, it is unclear how striking down part (a)(2) remedies the majority’s concerns because the remaining provision states that the magic words are "not necessarily the ex-elusive or conclusive means” of coming under the “support or oppose” language. § 163— 278.14A(a).

. Again, the Act imposes a $1000 limit on contributions for some judicial candidates. § 163-278.13(e2).

. Even if the plaintiffs could demonstrate standing to challenge the use of § 163-278.14A(a)(2) to define the term "expenditure” in the context of corporate expenditure limits, they could not prevail on their claim. The Supreme Court has held that direct expenditure and contribution limits on such entities are constitutional regulations, not " 'complete ban[s]’ on expression,” because corporations have the opportunity to engage in advocacy through the use of segregated funds (such as, for instance, NCRL’s use of NCRL-PAC). McConnell, 540 U.S. at 204, 124 S.Ct. 619 (quoting Beaumont, 539 U.S. at 162, 123 S.Ct. 2200). These regulations are justified by the compelling governmental interests of avoiding "the corrosive and distorting effects” of corporate involvement in politics as well as "circumvention of valid contribution limits.” Id. at 205, 124 S.Ct. 619 (internal quotation marks and alterations omitted). In this case, as described above, the Act only regulates express advocacy and its functional equivalent, as defined by the Supreme Court. Because § 163-278.19 limits contributions and expenditures that clearly advocate for or against a specific candidate in a specific election, it is clear that the provision does not limit a substantial amount of pure issue advocacy. See id. at 203-09, 123 S.Ct. 2200.

. The reporting requirements would also be an unconstitutional burden on associational rights if the disclosure of donor information resulted in threats or reprisals to donors, a claim that must be substantiated with evidence for the plaintiffs to prevail. See Buckley, 424 U.S. at 69-72, 96 S.Ct. 612. While the majority expresses a concern about reprisals or threats throughout its opinion, the record contains no evidence to support that concern.

. In fact, North Carolina adopted the "a major purpose” test as a more limited attempt to address the corrosive effect of non-profit election spending after this court struck down the state's ban on expenditures and contributions from the general treasury funds of non-profit corporations. J.A. 975 (deposition of the bill's sponsor, state representative Philip A. Baddour); see NCRL /, 168 F.3d at 713-14. Of course, after Beaumont, NCRL /’s holding as it relates to contribution bans has been abrogated.

. North Carolina has also tailored the reporting requirements to its interests by only requiring groups that spend or collect more than $3000 during an election to file reports. § 163-278.10A.

. The plaintiffs do not argue that the disclosure and reporting provisions applicable to “political committees” should not apply to NCRL-FIPE, and the majority's holding does not reach these other provisions.

. North Carolina also cites examples of actual corruption in North Carolina politics, supporting the state’s reasonable prediction that state politicians and contributors will likely find and exploit any existing loopholes in campaign finance regulations. See They Stained State's Honorable Reputation, The News & Observer, Sept. 9, 2007, at B2 (listing jailed and fined politicians and their crimes).

. Despite its purported concern about the limits on its speech imposed by the $4000 limit on contributions from each contributor, NCRL-FIPE has only raised a total of $3359 since it was created by NCRL and has only spent $339 on its independent expenditures, making it doubtful that the statute limits its ability to speak in any way.